# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KEITH W. CANTER,
    Plaintiff,

      v.

ALKERMES BLUE CARE ELECT
PREFERRED PROVIDER PLAN, *et al.*,
    Defendants.

Case No. 1:17-cv-399
Cole, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

    Plaintiff brings this action to recover benefits under the Employee Retirement Income and Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against defendant Blue Cross Blue Shield of Massachusetts ("BCBSMA").[1] This matter is before the Court on the parties' cross motions for judgment on the administrative record (Docs. 69, 70), their responsive memoranda (Docs. 71, 72), their reply memoranda (Docs. 73, 74), and their supplemental memoranda (Docs. 77, 79).[2]

## I. FACTUAL BACKGROUND

    Plaintiff was employed full-time at Alkermes, Inc. until July 6, 2015. By virtue of his employment with Alkermes, plaintiff was a participant in the Alkermes Blue Care Elect Preferred Provider Plan that is underwritten and insured by defendant BCBSMA. Alkermes is the Plan administrator and BCBSMA is the claims administrator. On July 6, 2015, plaintiff underwent a lumbar decompression and discectomy performed by Dr. Raj Kakarlapudi at the Laser Spine Institute. He subsequently filed a claim with BCBSMA requesting coverage. By

---

[1] On August 16, 2017, plaintiff dismissed, without prejudice, defendant Alkermes Blue Care Elect Preferred Provider Plan (Alkermes). (Doc. 17). Therefore, the sole remaining defendant is BCBSMA.
[2] The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

letter dated March 14, 2016, BCBSMA denied coverage for the surgery. In the letter, physician

reviewer Dr. Richard Lewis states, in relevant part:

> You are requesting coverage for bilateral transpedicular decompression and discectomy. We could not approve coverage of this service because you did not meet the medical necessity criteria required for coverage of lumbar transpedicular decompression and discectomy. For coverage, there must be documentation of our [sic] your symptoms, physical findings, imaging results, and specific non-operative therapies including anti-inflammatory medications, activity modification, and either a supervised home exercise program or physical therapy. Imaging must contain neural compression or a diagnosis made on electromyography, nerve conduction studies. The criteria used to guide this decision were InterQual® Smartsheet™ Hemilaminectomy, Lumbar +/- Discectomy/Foraminotomy. See enclosed policy.

(Doc. 25, PAGEID# 704). The letter also indicated that plaintiff, as the member, had the right to

appeal the decision. (*Id.*). Accompanying the denial letter was a "Fact Sheet," which described

BCBSMA's process for reviewing requests for services and the appeal procedure. (*Id.*,

PAGEID## 706-08).

On March 24, 2016, plaintiff submitted his pro se appeal via e-mail to BCBSMA. (*Id.*,

PAGEID# 673). In support of his appeal, plaintiff submitted a letter and various medical records

from Dr. Clifford Valentin, one of his physicians. (*Id.*, PAGEID# 675-703). The medical

records show that plaintiff began treatment with Dr. Valentin in August 2008 for leg, hip, and

back pain. (*Id.*, PAGEID# 697). Dr. Valentin reviewed a 2008 MRI of plaintiff's lumbar spine

showing a mild bulging disc with prominent end plate changes at L1-2, which was felt to be

compatible with degenerative end plate change with associated Modic marrow changes. (Doc.

25, PAGEID# 701; Doc. 87-1, PAGEID# 2362). Dr. Valentin diagnosed symptomatic L1-2

degenerative disc disease with right L1 radiculitis and scheduled a diagnostic/therapeutic right

L1-2 transforaminal epidural. (Doc. 25, PAGEID# 698).

Plaintiff next saw Dr. Valentin on September 14, 2012. Plaintiff complained of back pain, right buttock pain, and right sciatica. Dr. Valentin reported that plaintiff had been seen intermittently over the years with an L1 to advanced disc degeneration and L1-2 epidural in 2008. Dr. Valentin stated, "Over the last six weeks [he was] having recurrent symptoms and his back right buttock posterior thigh with associated numbness in the anterior distal quadriceps on the right. He initially did result (sic) of a prednisone dose taper but symptoms are beginning to return. He cannot sit and drive for long distances [from] the pain. Difficult in (sic) to maintain a sitting position. He denies any weakness." (*Id.*, PAGEID# 696). Under the heading "Pertinent Review of Symptoms," there is a reference to "Based on home exercises and previous physical therapy." (*Id.*). Dr. Valentin diagnosed clinical discogenic back pain and right radiculitis and a six-week history of L1-2 degenerative disc disease. He noted that an epidural injection in 2008 provided relief. Dr. Valentin recommended a follow-up MRI given plaintiff's continued symptoms. (*Id.*).

An MRI of the lumbar spine dated September 18, 2012 revealed a mild diffuse bulging disc with endplate changes at L1-2, which was felt to be most compatible with degenerative end plate change with associated Modic marrow changes. The MRI showed that at L4-L5, there was a stable mild diffuse disc bulge with mild anterior thecal sac compression though no central canal stenosis; stable mild to moderate bilateral neuroforaminal stenosis; and no evidence of nerve root compression. (Doc. 25, PAGEID## 699-700; Doc. 87-1, PAGEID# 2361).

At a September 21, 2012 follow-up visit, Dr. Valentin noted diagnostic test findings of "I vastus degeneration with desiccation at L1-2," and plaintiff's MRI was "unchanged from his previous MRI around 2008." (Doc. 25, PAGEID# 695). Dr. Valentin diagnosed clinical discogenic back pain with stable MRI and scheduled plaintiff for an epidural. (*Id.*). On

3

September 24, 2012, Dr. Valentin performed a right L5-S1 interlaminar epidural injection with fluoroscopic guidance. (Doc. 25, PAGEID# 702; Doc. 87-1, PAGEID#2363).

At his next visit with Dr. Valentin on October 12, 2012, plaintiff reported a two and one-half week history of pain in the "right buttock posterior thigh proximally." (Doc. 25, PAGEID# 694). Plaintiff reported patchy pain was worse with sitting in his right buttock, posterior lateral thigh, and occasionally in his postural lateral calf. Plaintiff reported he initially experienced significant aggravation of his back pain the first few days after the epidural and his symptoms were now at baseline. He further reported that Naprosyn was helping. The impression was clinical discogenic back pain with stable MRI and mild right noncompressive radiculitis, L5-S1 advanced radiographic, and L1-2 degenerative disc disease. Dr. Valentin and plaintiff agreed "to watch this for now," as plaintiff symptoms were intermittent and only with sitting. Plaintiff was instructed to continue to watch his ergonomics and continue taking Naprosyn. If he was no better in four weeks, he was instructed to schedule "an EMG of his right lower extremity given his noncompressive lumbar MRI." (Doc. 25, PAGEID# 694).

Plaintiff's next visit with Dr. Valentin was on April 8, 2013. Plaintiff reported increasingly more constant right back and flank pain with also some radiating pain to his right abdomen over the last week. (*Id.*, PAGEID# 692). On examination, plaintiff exhibited no weakness or sensory deficit; range of motion was minimally diminished in the flexion; straight leg raising was negative; reflexes were symmetrical at 2+ at the patellar and ankle tendons; and clonus was absent bilaterally at the feet. Examination of the right and left lower extremities was unremarkable. Dr. Valentin assessed "sciatica new right back and flank pain, intermittent right sciatica at L5, and non-compressive lumbar MRI." (*Id.*, PAGEID# 693). The treatment plan

4

included scheduling "a diagnostic and therapeutic right L5 transforaminal epidural, treating a noncompressive right lumbar radiculopathy." (*Id.*).

Accompanying the records from Dr. Valentin was plaintiff's appeal letter, which stated that prior to the surgery the Laser Spine Institute contacted BCBSMA and received pre-approval for the surgery. (*Id.*, PAGEID# 673). Plaintiff also stated that BCBSMA paid for both "the pre-opt and post-opt appointments" he had with the Laser Spine Institute. (*Id.*).

BCBSMA referred plaintiff's appeal to an independent review company, MCMC, who in turn selected Dr. David H. Segal, a board-certified neurological surgeon, to conduct the review. (*Id.*, PAGEID## 716-25, 773; Doc. 87-1, PAGEID## 2367-2370). Dr. Segal reviewed plaintiff's appeal letter, prior clinical notes, "faxed pages from the medical record," the Plan, the InterQual guidelines, and pertinent medical literature. (Doc. 25, PAGEID# 773). Dr. Segal concluded that plaintiff's procedure was "not medically necessary," and BCBSMA's denial was supported by "the medical literature[,]" including the InterQual guidelines. (*Id.*, PAGEID# 717-19; Doc. 87-1 at PAGEID## 2368-2370). In response to a series of questions posed by BCBSMA, Dr. Segal opined that plaintiff's surgery was a "covered service" under the Plan. He also stated in response to other questions posed by BCBSMA:

> **Question:**
> "2. Do you believe that the member has failed all effective therapy for this condition?"
> **Dr. Segal's response:**
> "2. No, I do not you (sic) believe that the member has failed all effective therapy for this condition."
> **Question:**
> "3. Is the requested service medically necessary for the member's condition?"
> **Dr. Segal's response:**
> "3. No the requested service is not medically necessary for the member's condition."
> **Question:**
> "4. What other standard treatment options would you consider a reasonable alternative for this member?"

**Dr. Segal's response:**

"4. Other standard treatment options would you consider a reasonable alternative for this member includes normal PT and exercise program, repeat ESI with TESI at L4-5 R, pt should have had a repeat MRI, last documented MRI from 2012."

**Question:**

"5. Does the medical literature support your opinion?"

**Dr. Segal's response:**

"5. Yes, the medical literature does support your (sic) opinion."

**Question:**

"6. Is there documentation on imaging studies showing compression of the right L4 or L5 nerve root?"

**Dr. Segal's response:**

"6. NO, in the records provided, there is not documentation on imaging studies showing compression of the right L4 OR L5 nerve root."

**Question:**

"7. Is there a documentation of an EMG demonstrating nerve compression?"

**Dr. Segal's response:**

"7. NO, in the records provided, there is not documentation of an EMG demonstrating nerve compression."

**Question:**

"8. Is there documentation along with duration of failure of conservative measures including use of non-steroidal anti-inflammatory medication for 3 weeks, physical therapy for 6 weeks and activity modification for 6 weeks preceding the surgery on 07/06/2015?"

**Dr. Segal's response:**

"8. NO, in the records provided, there is not documentation along with duration of failure of conservative measures including use of non-steroidal anti-inflammatory medication for 3 weeks, physical therapy for 6 weeks and activity modification for 6 weeks preceding the surgery on 07/06/2015. There is documentation of intermittent NSAID use in 2012 but not clearly documented that it was for 6 consecutive weeks."

**Question:**

"9. Is there documentation to support mdeical (sic) necessity for placement of percutaneous nerve stimulator motor unit?"

**Dr. Segal's response:**

"9. NO, there is not documentation to support mdeical (sic) necessity for placement of percutaneous nerve stimulator motor unit."

(Doc. 25, PAGEID# 717; Doc. 87-1, PAGEID# 2368). Dr. Segal listed the rationale for his opinion as follows:

> The requested service IS NOT medically necessary for the member's condition based on failure to meet criteria in the provided InterQual guidelines. Records submitted do not support criteria in guidelines:

6

1. There is no documented motor or sensory deficit.
2. There is no weakness.
3. There is no documented nerve root compression on imaging studies.
4. There is no worsening motor deficit.
5. There is no documentation of PT, home exercise or activity modification.
6. No documentation of failure of PT, home exercise or activity modification.

I do not you (sic) believe that the member has failed all effective therapy for this condition. The member has documentation of NSAID use and 3 ESI in 2012/13 that period of conservative care is not recent enough to qualify as recent failure of conservative therapy (should be at least within last year), and there is no documentation of any type of physical therapy modality.

Definition of conservative care in guidelines:
"This criteria point includes therapy by provider instruction to the patient, as well as supervised training through formal therapy (e.g., OT, PT). Therapy may not be appropriate if symptoms have been present for a long period of time and exercise has been attempted previously, or if symptoms are severe on presentation. The decision to recommend a home (i.e., unsupervised) therapy program or supervised therapy is a matter of clinical judgment. Activity modification for lumbar radiculopathy involves limiting activities that provoke or aggravate symptoms, such as heavy lifting, repetitive bending, or prolonged standing. PT with exercises to improve posture and strengthen the lumbar muscles may be beneficial in some patients."

(Doc. 25, PAGEID# 718; Doc. 87-1, PAGEID# 2369).

On April 22, 2016, Carol Flanagan Abreu, Case Specialist of the Member Grievance Program for BCBSMA, denied plaintiff's appeal because "[a]n actively practicing non-[BCBSMA] physician board-certified in Neurological Surgery reviewed [plaintiff's] request" and determined that plaintiff's procedure "did not meet the medical necessity criteria required for coverage of lumbar hemilaminectomy and placement of percutaneous nerve stimulator motor unit because there is no documented motor or sensory deficit, weakness, documented nerve root compression on imaging studies or worsening motor deficit." (Doc. 25, PAGEID## 773-776). Ms. Flanagan Abreu also explained that there was "no documentation of failure of physical therapy home exercise or activity modification." (Id.). The letter stated that Dr. Segal made his decision using as a guide the "enclosed InterQual® clinical criteria," which is a nationally-

recognized program that BCBSMA used to determine if the care met the medical necessity statement. (*Id.* at PAGEID## 774-75). The letter informed plaintiff that this completed the internal grievance process for plaintiff's request, and he had the option of seeking a final review from the Commonwealth of Massachusetts Health Policy Commission's Office of Patient Protection or bringing a lawsuit under Section 502(a) of ERISA. (*Id.* at PAGEID# 775).

On May 13, 2016, the Human Resources Department of plaintiff's employer, Alkermes, Inc., responded to plaintiff's inquiry about the denial of his appeal by BCBSMA. An email from Alkermes' Human Resources Manager, Kelly Bryant, informed plaintiff that he was eligible to file a second and final grievance:

> I shared this with our representative at BCBS and am including his response below. It sounds like there was not a preapproval in place. There are no records of this before the surgery, only after. *At this point, they have advised that there is nothing else they can do on their end and that you are eligible to file a second and final grievance.* A suggestion at this point would be to talk to your doctor's office to get more information about their call to BCBS. There is no record of it with BCBS, so they will need to provide some evidence that it occurred. On the sticky notes in your folder, it shows that "no precertification was required" but I'm not sure what that is in reference to. I'll put the notes in your interoffice mailbox. Let me know how we can help.

> I do see that Keith Cantor (sic) has a surgical claim denied on 7/6/2015. It (sic) denied because we required medical records and an itemized bill. I see that information was received; however, the documentation provided did not show medical necessity. A grievance was submitted and denied. This is a high dollar claim with an out of network provider. There was no authorization on file at the time of services. It looks as though they tried to obtain an authorization after the fact (on 3/3/16). That was denied because the member did not meet the criteria for surgery based on the medical records.

(Doc. 1-4, PAGEID# 166) (emphasis added).

In July 2016, plaintiff retained counsel who requested multiple items, including the Plan documents, from Ms. Flanagan Abreu. (*Id.* at PAGEID# 167-68). Plaintiff's counsel informed Ms. Flanagan Abreu of BCBSMA's alleged failure to comply with claim regulations under 29

C.F.R. § 2560.503-1, *et seq.* and to accurately and fully inform plaintiff of his right to obtain a full and fair review. (*Id.*, PAGEID# 167). On November 23, 2016, plaintiff, through counsel, submitted a second appeal of the denial of payment for his lumbar decompression and discectomy procedure. (Doc. 25, PAGEID## 732-72). Plaintiff's second appeal included a narrative, medical records, and a Medical Necessity Opinion Questionnaire completed by treating surgeon Dr. Kakarlapudi. (*Id.*).

Dr. Kakarlapudi's medical necessity questionnaire states that he first examined plaintiff on July 2, 2015. Dr. Kakarlapudi reported that he has clinically observed or treated plaintiff for chronic lower back pain, extremity numbness, radiculopathy, displacement of lumbar intervertebral disc without myelopathy lumbago or sciatica due to displacement of intervertebral disc, sensory deficit, weakness (specifically noting "weak in right knee extension and ankle dorsiflexion"), nerve root compression (specifically noting "MRI showed foraminal nerve compression by disc herniation"), motor or sensory deficit, disc herniation, nerve impingement, and stenosis, among others. (Doc. 25, PAGEID## 740-742). Dr. Kakarlapudi reported that plaintiff "had a disc herniation that was putting pressure on nerve causing pain in back and down the leg. I performed a decompression surgical procedure to remove bone spurs and disc bulge causing pressure on nerve." (*Id.*, PAGEID# 742). Dr. Kakarlapudi stated that the lumbar hemilaminectomy and placement of a percutaneous nerve stimulator motor unit was essential to provide an improved net outcome of displacement of lumbar intervertebral disc without myelopathy, lumbago or sciatica due to displacement of intervertebral disc. He also opined that (1) the procedure was as beneficial or more beneficial than established alternatives that could have been contemplated in a reasonable clinical judgment; (2) the surgical intervention was performed on an out-patient basis and was the least intensive medical care setting; (3) plaintiff's

treatment was not as costly as alternative procedures that were likely to produce the same therapeutic or diagnostic results to treat plaintiff's conditions; and (4) the procedure was not performed for plaintiff's convenience and was medically appropriate using sound clinical judgment. (*Id.*, PAGEID## 743-44).

Dr. Kakarlapudi confirmed that plaintiff's pre-surgical conservative treatment, which included injections, NSAIDs, and home exercise, over the course of approximately seven years was unsuccessful. (*Id.*, PAGEID## 744-45). He opined that the numbness plaintiff experienced in his thigh was a sensory deficit, and he had symptoms of weakness prior to surgery. Dr. Kakarlapudi stated there was nerve root compression documented on imaging studies prior to surgery. Dr. Kakarlapudi described the facts that supported the use of a percutaneous nerve stimulator motor unit stating, "It provides pain control post-operatively to minimize post-operative pain control and also to avoid inpatient admission. It also provide[s] faster recovery from a mobility standpoint." (*Id.*, PAGEID# 745).

Dr. Kakarlapudi concluded that plaintiff's lumbar hemilaminectomy and the placement of a percutaneous nerve stimulator motor unit was medically necessary using proven clinical judgment for plaintiff's symptoms; the surgical procedure was consistent with the generally accepted standard of professional medical practice and the medical community; and the procedure was clinically appropriate in terms of the nature and condition of plaintiff's diagnosis and symptomatologies. (*Id.*, PAGEID# 743).

After receiving no response from BCBSMA to his November 23, 2016 appeal letter, plaintiff's counsel sent another letter to BCBSMA on March 15, 2017 stating that if a response was not received by April 3, 2017, "we will assume that Mr. Canter has exhausted all of his administrative remedies." (Doc. 1-4, PAGEID# 226). BCBSMA did not respond to the letter.

On June 12, 2017, plaintiff filed suit in this Court. Plaintiff brings claims alleging that BCBSMA: (1) unreasonably denied his claim for payment "without legal basis under the Plan documents"; (2) breached fiduciary duties owed to him under 29 U.S.C. § 1104(a)(1); (3) failed to provide adequate notice to him when it denied his claim and appeal; and (4) violated 29 U.S.C. § 1132(c)(1) by failing to produce the entire Plan to him upon request. (Complaint, Doc. 1). Plaintiff argues that BCBSMA erred in denying coverage for his lumbar surgery for multiple reasons. First, plaintiff argues that BCBSMA failed to follow the terms of the Plan by substituting an "outside document, InterQual, in lieu of applying the Plan language." (Doc. 69 at 17). Second, plaintiff argues that BCBSMA's decision is factually unsubstantiated and was not deliberately reasoned based on the facts. (*Id.* at 19). Third, plaintiff alleges that BCBSMA violated his procedural rights by failing to provide adequate notice to assure a full and fair review as required by 29 U.S.C. § 1133 and by relying on the opinion of Dr. Segal, whom plaintiff alleges was incompetent to review whether the lumbar surgery was medically necessary under the terms of the Plan. (*Id.* at 20-25). Fourth, plaintiff alleges that BCBSMA had a "substantial conflict of interest" because it selectively treated plaintiff's claim as a "high dollar claim." (*Id.* at 25). Fifth, plaintiff alleges that BCBSMA had an obligation to process plaintiff's second appeal based on the representations provided to him by Kelly Bryant, the HR Representative of Alkermes, Inc., that plaintiff was eligible to file a second appeal and grievance. (*Id.* at 26-27). Plaintiff argues that the evidence submitted in connection with his second appeal is substantial and relevant. (*Id.* at 27-30).

After the administrative record was filed in this case and the parties submitted their briefs, BCBSMA notified the Court that it discovered that the Subscriber Certificate (the relevant Plan document) contained in the administrative record is not the Subscriber Certificate that was

11

in effect during the relevant time period. (Doc. 77). Counsel for BCBSMA represented that this error was due to a system database issue. BCBSMA has submitted the operative Subscriber Certificate, as well as the incorrect Subscriber Certificate contained in the administrative record, which includes orange strikethrough text representing language that appears in the incorrect Subscriber Certificate and green text representing language that appears in both the operative and incorrect Subscriber Certificates but in different locations. (*Id.*). Counsel for plaintiff stipulates that the newly produced Subscriber Certificate is the operative one that should be used by the Court. (Doc. 79 at 3). Therefore, the Court will consider the newly produced Subscriber Certificate as the operative Plan document in this case.

## II. PLAINTIFF'S PROCEDURAL CLAIMS

### A. Scope of Judicial Review for ERISA Procedural Claims

Plaintiff alleges that BCBSMA violated his procedural rights by failing to provide adequate notice of the denial decision to assure a full and fair review as required by 29 U.S.C. § 1133. (Doc. 69 at 22-23). Plaintiff further alleges that BCBSMA had an obligation to process his second appeal based on the representations provided to him by Kelly Bryant, Alkermes' HR representative, that he was eligible to file a second appeal and grievance. (*Id.* at 26-27).

ERISA Section 503, 29 U.S.C. § 1133, governs claims procedures and requires that employee benefit plans:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. Whether the procedures employed by a Plan or claims administrator in denying benefits satisfies the § 1133 requirements are subject to *de novo* review by the Court. *Houston v. Unum Life Ins. Co. of Am.*, 246 F. App'x 293, 299 (6th Cir. 2007) (citing *McCartha v. National City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005) (citing *Kent v. United Omaha Life Ins. Co.*, 96 F.3d 803, 806 (6th Cir. 1996)).

The *de novo* standard of review generally "requires the Court to confine its review to the administrative record and determine whether the plan administrator made a 'correct decision' without according the administrator any deference or presumption of correctness." *Temponeras v. United States Life Ins. Co. of Am.*, 185 F. Supp. 3d 1010, 1017 (S.D. Ohio 2016) (citing *Lipker v. AK Steel Corp.*, 698 F.3d 923, 928 (6th Cir. 2012)). *De novo* review simply requires that a Court decide whether or not it agrees with the decision under review. *Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990). "When interpreting ERISA plan provisions, general principles of contract law apply; unambiguous terms are given their 'plain meaning in an ordinary and popular sense.'" *Lipker*, 698 F.3d at 928 (quoting *Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 343 (6th Cir. 2011) (internal quotation omitted)). The *de novo* standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator. *Wilkins*, 150 F.3d at 613. "When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Id.* at 616 (internal quotations omitted).

There is an exception to the rule limiting a court's review to the administrative record: when evidence outside the record "is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or

alleged bias on its part." *Wilkins*, 150 F.3d at 619. In this case, plaintiff alleges his procedural rights were violated when BCBSMA failed to notify him in the first denial letter of the steps he must take to perfect his appeal and failed to process his second appeal, thereby denying him a full and fair review of his claim. As explained below, plaintiff has made a colorable due process challenge to the procedures used in this case; therefore, the Court is permitted to review evidence not before the Plan administrator in reviewing plaintiff's procedural challenges.

**B. Whether BCBSBA's March 14, 2016 denial letter violated plaintiff's procedural rights.**

Plaintiff contends that BCBSMA violated his procedural rights when the March 14, 2016 denial notice failed to notify him of the information that was needed to have his claim perfected. He contends the lack of adequate notice denied him a "full and fair review" of his claim under 29 U.S.C. § 1133, which required BCBSMA to provide adequate notice of the specific reasons for the denial decision "written in a manner calculated to be understood by the participant."

The implementing regulations for § 1133 explain the necessary content of the notice:

A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

14

29 C.F.R. 2560.503–1(g).[3] As explained by the Sixth Circuit:

> The "essential purpose" of the statute is twofold: (1) to notify the claimant of the *specific* reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed *by the fiduciary. See Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006) (citing *Kent*, 96 F.3d at 807). This circuit applies a "substantial compliance" test to determine whether § 1133's notice requirements have been met. *See id.* The test "considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." *Id.* (citing cases). If the communications between the administrator and participant as a whole fulfill the twin purposes of § 1133, the administrator's decision will be upheld even where the "particular communication does not meet those requirements." *Id.* (quoting *Kent*, 96 F.3d at 807).

*Wenner v. Sun Life Assur. Co. of Canada*, 482 F.3d 878, 882 (6th Cir. 2007) (emphasis in the original). Under the substantial compliance standard, "[t]he question is whether [plaintiff] was supplied with a statement of reasons that under the circumstances of the case permitted a sufficiently clear understanding of the administrator's decision to permit effective review." *Moore*, 458 F.3d at 436 (quoting *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 662 (7th Cir. 1997)).

Upon reviewing all of the communications between BCBSMA and plaintiff, the Court finds that BCBSMA failed to substantially comply with Section 503 of ERISA. The March 2016 denial letter upon which plaintiff relied to file his pro se appeal states, in relevant part:

> You are requesting coverage for bilateral transpedicular decompression and discectomy. We could not approve coverage of this service because you did not meet the medical necessity criteria required for coverage of lumbar transpedicular decompression and discectomy. For coverage, there must be documentation of our

---

[3] BCBSMA must comply with these notice requirements pursuant to paragraph (c) of § 2560.503–1, which states:

> *Claims procedure for an insured welfare or pension plan.*
> (1) To the extent that benefits under an employee benefit plan are provided or administered by an insurance company, insurance service, or other similar organization which is subject to regulation under the insurance laws of one or more States, the claims procedure pertaining to such benefits may provide for filing of a claim for benefits with and notice of decision by such company, service or organization.

29 CFR § 2560.503–1(c). *See also VanderKlok v. Provident Life and Acc. Ins. Co. Inc.*, 956 F.2d 610, 616 n.3. (6th Cir. 1992).

[sic] your symptoms, physical findings, imaging results, and specific non-operative therapies including anti-inflammatory medications, activity modification, and either a supervised home exercise program or physical therapy. Imaging must contain neural compression or a diagnosis made on electromyography, nerve conduction studies. The criteria used to guide this decision were InterQual® Smartsheet™ Hemilaminectomy, Lumbar +/- Discectomy/Foraminotomy. See enclosed policy.

(Doc. 25 at PAGEID# 704). This denial notice fails to advise plaintiff how his medical records and information fell short of meeting the medical necessity definition of the Plan, including the InterQual criteria. The letter advises plaintiff that his surgery was not medically necessary, but it fails to explain why. While the letter identifies the InterQual criteria, it never explains which, if any, of the listed "coverage" elements plaintiff failed to meet.[4] Nor does the denial letter provide plaintiff with instructions on how to cure his claim, including what additional information he needed to submit to satisfy the "medical necessity" requirement. The letter does not contain a "description of any additional material or information necessary for [plaintiff] to perfect the claim and an explanation of why such material or information is necessary" as required by the regulations. *See* 29 C.F.R. 2560.503–1(g). Indeed, the deficiencies of the denial letter are striking when the initial denial letter is compared with the April 22, 2016 appeal decision letter in which BCBSMA advised plaintiff of the specific reasons for its decision: "there is no documented motor or sensory deficit, weakness, documented nerve root compression on imaging studies or worsening motor deficit. There is also no documentation of failure of physical therapy

---

[4] The denial letter in this case is unlike the denial notice in *Smith v. Health Services of Coshocton*, 314 F. App'x 848 (6th Cir. 2009), cited by BCBSMA. (Doc. 72 at 14). In *Smith*, before the first decision letter denying coverage was ever issued, there were "several communications between Smith and Medical Mutual in which Medical Mutual asked that Smith or her doctors provide documented evidence of rashes or ulcerations under Smith's excess skin and chronic intertrigo that recurred or remained despite medical treatment" to show that the plaintiff's request for panniculectomy surgery was not cosmetic but medically necessary under the plan. The Court of Appeals noted that Medical Mutual's requests for information "explicitly asked [the plaintiff] to send in documents supporting these *specific clinical criteria.*" *Id.* at 858 (emphasis added). In the instant case, in contrast, neither the initial denial letter nor any communications from BCBSMA prior to the issuance of the denial letter ever advised plaintiff of the "specific clinical criteria" that he failed to satisfy under the Plan.

home exercise or activity modification." (Doc. 25, PAGEID# 773). The April 2016 appeal decision letter goes on to identify the specific records that were considered, the clinical and objective findings considered, and the proximity of such findings to the medical procedure under review "to qualify as recent failure of conservative therapy (should be at least within last year)." (*Id.*, PAGEID# 774). Plaintiff was not informed of any of these specific reasons in the March 2016 denial letter, which would have enabled him to obtain information to cure the deficiencies and perfect his appeal. This is especially critical in this case given BCBSMA's position that plaintiff's second appeal was a nullity, and therefore the Court's review is limited to the records BCBSMA had before it on appeal, which exclude Dr. Kakarlapudi's medical opinion questionnaire and other relevant records, as explained below. It was only after plaintiff received notice of the specific deficiencies set forth in the April 2016 appeal letter that plaintiff then submitted additional evidence from his treating surgeon which specifically addressed the medical necessity criteria of the Plan—evidence BCBSMA asserts cannot be considered by this Court in reviewing its decision.

Moreover, the March 2016 denial letter omits any consideration of the Plan terms defining medical necessity, all of which are to be used in the decision-making process, other than the InterQual guidelines. The Plan defines "medical necessity" as follows:

> To receive your health plan coverage, all of your health care services and supplies must be medically necessary and appropriate for your health care needs. . . . *Blue Cross and Blue Shield* decides which health care services and supplies that you receive (or you are planning to receive) are *medically necessary* and appropriate for coverage. It will do this **by using all of the guidelines described below.**

> All health care services must be required services that a health care provider, using prudent clinical judgment, would provide to a patient in order to prevent or to evaluate or to diagnose or to treat an illness, injury, disease, or its symptoms. And, these health care services must also be:

17

- Furnished in accordance with generally accepted standards of professional medical practice (as recognized by the relevant medical community);
- Clinically appropriate, in terms of type, frequency, extent, site, and duration; and they must be considered effective for your illness, injury, or disease;
- Consistent with the diagnosis and treatment of your condition and in accordance with *Blue Cross and Blue Shield medical policies and medical technology assessment criteria*;
- Essential to improve your net health outcome and as beneficial as any established alternatives that are covered by *Blue Cross and Blue Shield*;
- Consistent with the level of skilled services that are furnished and furnished in the least intensive type of medical care setting that is required by your medical condition; and
- Not more costly than an alternative service or sequence of services at least as likely to produce the same therapeutic or diagnostic results to diagnose or treat your illness, injury, or disease.

(Doc. 77-2, PAGEID# 1655) (emphasis added).

The March 2016 denial letter advised plaintiff that BCBSMA relied solely on the InterQual criteria to deny plaintiff's claim to the exclusion of the other medical necessity criteria set forth in the Plan. While the Court finds the InterQual guidelines are one consideration in determining "medical necessity" under the Plan, as explained *infra*, they are not the sole criteria. In fact, the InterQual (IQ) guidelines themselves note the limitations of their use:

> IQ reflects clinical interpretations and analyses and cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the *sole basis* for definitive decision. IQ is intended solely for use as screening guidelines with respect to medical appropriateness of healthcare serves. All ultimate care decisions are strictly and solely the obligation and responsibility of your health care provider.

(Doc. 82, PAGEID# 1965) (emphasis added). The Plan in this case gives no less than six other criteria that will be "used"[5] to determine medical necessity, but the only criteria noted in the denial letter are the InterQual guidelines. (Doc. 77-2, PAGEID# 1655). Had plaintiff been advised that the medical necessity determination included considerations such as whether his

---

[5] For comparison, the Plan, as amended, now provides that medical necessity will be determined by *"referring to the guidelines described below,"* as opposed to *"using all of the guidelines described below."* (Doc. 77-3, PAGEID# 1779) (emphasis added).

surgery was, *inter alia*, "[f]urnished in accordance with generally accepted standards of professional medical practice (as recognized by the relevant medical community)"; "[c]linically appropriate, in terms of type, frequency, extent, site, and duration"; and "considered effective for your illness, injury, or disease" (Doc. 77-2, PAGEID# 1655), plaintiff could then have elicited specific narrative information from his treating surgeon to elucidate why his doctor believed the surgery was medically necessary. BCBSMA's "failure to provide specific reasons meant that plaintiff was not apprised of the deficiency in his claim which he could attempt to correct with additional evidence upon review." *VanderKlok*, 956 F.2d at 616.

Additionally, BCBSMA's March 2016 denial letter failed to notify plaintiff of the evidence it relied on and that its decision was based on an incomplete record. "[T]he persistent core requirements of review intended to be full and fair include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Zack v. McLaren Health Advantage, Inc.*, 340 F. Supp. 3d 648, 662-63 (E.D. Mich. 2018) (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (internal quotation omitted)).

The March 2016 denial letter failed to advise plaintiff of the records BCBSMA considered in making its decision. Before it made its denial decision, BCBSMA repeatedly advised plaintiff that it had requested his medical records. (Doc. 26, PAGEID## 990, 1002; Doc. 87-1, PAGEID## 2387, 2399). BCBSMA requested medical records directly from the Laser Spine Institute, the entity which performed plaintiff's surgery. (Doc. 26, PAGEID# 1008). However, BCBSMA's request for records was specifically limited to the date range of "July 6, 2015 to July 6, 2015," the date of plaintiff's actual surgery. (Doc. 26, PAGEID# 1008,

requesting "Complete Medical Record" for "Date Range (if applicable) 7/6/2015-7/6/2015").

Plaintiff's treatment at the Laser Spine Institute, however, was not limited solely to the date of

surgery. Plaintiff had pre-operative visits at the Laser Spine Institute and such records do not

appear in the administrative record. BCBSMA was on notice of these pre-operative visits

because BCBSMA provided medical coverage for these visits. The administrative record

indicates that BCBSMA paid for a pre-operative MRI and x-rays on July 1, 2015. (Doc. 25,

PAGEID# 738). However, these objective tests were not requested by BCBSMA and do not

appear in the record. In addition, it appears BCBSMA paid insurance coverage for a pre-

operative visit with Dr. Kakarlapudi on July 2, 2015. (*Id.*). BCBSMA did not request this

record, which is also missing from the administrative record. In his pro se appeal from the initial

denial of his claim, plaintiff again advised BCBSMA of these visits: "I am beside myself to think

that BCBS has paid the pre-opt and post-opt appointments and has denied the claim of my

surgery knowing that the pre-approval for my surgery that LSI done was for surgery in itself."

(Doc. 25, PAGEID# 673). While BCBSMA may argue that plaintiff was obligated to obtain

these records in support of his appeal, where BCBSMA undertook the obligation to request such

records from the Laser Spine Institute and limited its request to the date of surgery without

notifying plaintiff (*see* Doc. 26, PAGEID## 900, 1002, 1008; Doc. 87-1, PAGEID# 2387, 2399),

plaintiff cannot be faulted for not knowing these medical records were not already a part of the

administrative review process.[6] BCBSMA's notice of denial failed to advise plaintiff that its

request for records from the Laser Spine Institute was limited solely to the date of surgery.

---

[6] BCBSMA asserts that it "repeatedly requested from Mr. Canter complete medical records and an itemized bill to review the claim" (Doc. 70, PAGEID# 1380, citing Doc. 26, PAGEID## 990, 994, 1002, 1008), but "[d]espite BCBSMA's requests, the only records submitted were Mr. Canter's pre-operative and operative reports." (Doc. 70 at PAGEID# 1380, citing Doc. 26, PAGEID## 1007-1024). Contrary to BCBSMA's representation, *BCBSMA* requested records from the Laser Spine Institute but failed to request the relevant pre-operative tests and clinical records.

Therefore, plaintiff could not have known that BCBSMA failed to obtain the very records upon which it based its denial decision (e.g., the absence of current MRI evidence showing nerve compression). BCBSMA cannot limit its request for medical information and then deny the claim on the basis of a lack of medical documentation.

The initial denial notice failed to advise plaintiff of the specific reasons he did not meet the medical necessity definition set forth in the Plan or the specific evidence BCBSMA relied upon in making its decision. As a result, plaintiff was denied the opportunity to adequately prepare for further administrative review as well as for an appeal to federal court. Considering all of the communications between BCBSMA and plaintiff, the Court determines that the information provided to plaintiff was insufficient under the circumstances. *Wenner*, 482 F.3d at 882. The denial letter did not substantially comply with the procedural requirements of 29 U.S.C. § 1133, and plaintiff was denied a fair opportunity for review of his claim.

### C. The failure to process plaintiff's "second" appeal.

Plaintiff contends the Plan administrator, an HR representative at Alkermes, advised him on May 13, 2016 that he was "eligible to file a second and final grievance" based on an alleged representation by BCBSMA in response to plaintiff's denial of his first appeal. (Doc. 1-4, PAGEID# 166). In reliance on this representation, plaintiff retained counsel, sent a letter dated November 10, 2016 to BCBSMA notifying it that he was filing a second appeal, and submitted additional medical records, including a Medical Necessity Opinion Questionnaire from Dr. Kakarlapudi. BCBSMA did not respond to the letter, and by letter dated March 15, 2017, plaintiff advised BCBSMA that if a response was not received by April 3, 2017, plaintiff would assume that he exhausted all of his administrative remedies and pursue his legal options. (Doc. 1-4, PAGEID# 226-27). Plaintiff states that he reasonably relied on the Alkermes' HR

employee's representations and pursued a second internal appeal instead of pursuing an external review under the Plan. (Doc. 73 at 26).

BCBSMA contends that the Alkermes' HR representative, who is not an agent of BCBSMA, had no authority to bind it to a second appeal. In addition, BCBSMA asserts that the Plan provides for one appeal and its correspondence with plaintiff was consistent with its contention that plaintiff was entitled to only one appeal. BCBSMA maintains that the Plan "treats Mr. Canter's right to appeal as a singular noun" and does not mention a second appeal. (Doc. 72 at 17, citing Doc. 26, PAGEID# 900 ("When you make an appeal about a medical necessity coverage decision . . . "); *id.* at 896-906 (outlining claim review procedures without mentioning second appeal)). BCBSMA asserts that its "correspondence with [Mr. Canter] is consistent with its contention that [Mr. Canter] was entitled to only one appeal." (Doc. 72 at 17, citing *Huffaker v. Metro. Life Ins.*, 271 F. App'x 493, 499 (6th Cir. 2008)). BCBSMA states that the letter explaining the denial of plaintiff's claim included a Fact Sheet advising plaintiff of his "right to appeal this decision through the Blue Cross Blue Shield Member Appeal and Grievance Program . . . ." (*Id.*, citing Doc. 25, PAGEID# 704). While the Fact Sheet explains the appeal process and the plan member's options after appeal, it does not mention a second appeal to BCBSMA. (*Id.*, citing Doc. 25, PAGEID## 706-08).

BCBSMA is correct that where a Plan's language indicates there is only one appeal from a denial of benefits and the process does not mention a second appeal, the plan administrator may properly interpret the plan as permitting only one appeal and need not consider evidence that is presented after denial of the appeal. *See Huffaker*, 271 F. App'x at 498-99. Unlike *Huffaker*, however, this case involves an affirmative representation by the Plan administrator, Alkermes, that a second internal review was permitted. A plan fiduciary has a duty to convey

"complete and accurate information material to the beneficiary's circumstance." *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999). Plaintiff relied on this representation, retained counsel, and filed a second appeal with additional evidence, instead of filing an external review with the Commonwealth of Massachusetts Health Policy Commission's Office of Patient Protection. Had plaintiff requested an external review, and not filed a second internal appeal, he would have been permitted to submit additional medical evidence in support of the review, including the report from his treating surgeon, Dr. Kakarlapudi. (Doc. 25, PAGEID# 784). Because plaintiff reasonably relied on the Plan administrator's representation that he could file a "second and final grievance," plaintiff forfeited his right to an external review and the opportunity to present additional evidence into the administrative record. The "duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Krohn*, 173 F.3d at 548 (citing *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3rd Cir. 1993)). This misrepresentation materially prejudiced plaintiff and resulted in the omission of a critical piece of evidence in his subsequent appeal to this Court.

The question arises whether the representation by Ms. Bryant, Alkermes' HR representative, which was allegedly based on information from a BCBSMA employee, is binding on BCBSMA. BCBSMA alleges that Ms. Bryant, who is an employee of Alkermes, is not an agent of BCBSMA; BCBSMA never held her out as such; and, therefore, Ms. Bryant had no authority, apparent or otherwise, to bind BCBSMA. (Doc. 72 at 18).

Principles of agency, including those related to apparent authority, may be used in resolving ERISA claims. *Deschamps v. Bridgestone Americas, Inc. Salaried Employees Ret.*

*Plan*, 840 F.3d 267, 278 (6th Cir. 2016) (citing cases). "Apparent authority exists when (1) the principal manifests that another is the principal's agent, and (2) it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal." *Id.* at 279 (citing *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 593 (6th Cir. 1998)). As previously noted by the Sixth Circuit, "apparent authority may attach even when the agent's acts are unauthorized." *Richards v. Gen. Motors Corp.*, 991 F.2d 1227, 1232 (6th Cir. 1993).

In connection with the denial letter, plaintiff was provided a "Fact Sheet," which explained the appeal process and the plan member's options after appeal. Under the section entitled "A member's right to appeal," BCBSMA advises: "Members who live outside of Massachusetts may have other rights based on laws based in their home state. Members should check with their employer's benefit office for more information." (Doc. 25, at PAGEID# 708). Plaintiff, a resident of Ohio, in fact communicated with his employer's benefit office (i.e., Alkermes' HR representative Ms. Bryant) for help with the denial of his medical claim. By directing plan members who lived outside of Massachusetts to their employer's benefit office, BCBSMA vested such representatives with apparent authority to speak on its behalf with questions about appeals. Plaintiff did so and in reliance on Ms. Bryant's representation "to file a second and final grievance" suffered to his detriment. As such, BCBSMA denied plaintiff a full and fair review of his claim.

BCBSMA argues that even if it was required to consider plaintiff's second appeal, the result would have been the same: a denial based on lack of medical necessity. (Doc. 72 at 19). BCBSMA contends that the "Medical Necessity Opinion Questionnaire" completed by plaintiff's surgeon is unsupported by clinical documentation and contradicted by the medical records that

were submitted to BCBSMA when it was reviewing plaintiff's claim. (*Id.* at 21, citing for comparison Doc. 25, PAGEID# 699, with Doc. 25, PAGEID# 740; Doc. 26, PAGEID## 1003-06). BCBSMA contends, for example, that the Questionnaire states that an "MRI showed . . . nerve compression by disc herniation" (AR I, Doc. 25, PAGEID# 740), but the 2008 and 2012 MRIs in the administrative record show "no evidence of nerve root compression." (*Id.*, citing Doc. 25, PAGEID# 699).

BCBSMA is correct that a remand for a "full and fair" review for a § 1133 procedural violation is not required if it would "represent a useless formality." *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005) (citing *Kent v. United Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996)). Remand in this case would not be a useless formality because the contemporaneous MRI and clinical evidence from the Laser Spine Institute that BCBSMA failed to request would likely support Dr. Kakarlapudi's narrative report. Dr. Kakarlapudi's November 2016 Questionnaire specifically references an MRI that showed "foraminal nerve compression by disc herniation" (presumably the July 1, 2015 MRI for which BCBSMA provided insurance coverage) and other clinical findings that strongly suggest there is objective evidence to support a finding of medical necessity. The Court cannot conclude at this juncture that the failure to allow plaintiff's second appeal, in light of the other procedural issues discussed above, is simply harmless error or that remand would be a futile gesture.

In sum, the Court concludes that plaintiff was denied a full and fair review of his claim by BCBSMA. Therefore, plaintiff should be granted judgment on the record on his procedural claims.[7]

## III. PLAINTIFF'S SUBSTANTIVE CLAIMS

### A. The Scope of Judicial Review for Plaintiff's Substantive Claims

The parties dispute the scope of the Court's review of the substantive issues in this case. Plaintiff argues that the Court's review of BCBSMA's decision to deny benefits in this case is *de novo*. BCBSMA contends the more deferential arbitrary and capricious standard of review applies. Both parties assert that the newly produced Subscriber Certificate reinforces their respective positions on the appropriate standard of review in this case.

Courts ordinarily review an ERISA plan administrator's substantive decision denying benefits *de novo*. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (citing *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659-60 (6th Cir. 2004). However, when "the plan administrator is given the discretionary authority to determine eligibility for benefits or to construe the plan terms, [courts] review the administrator's decision to deny benefits using the highly deferential arbitrary and capricious standard of review." *Id.* (internal quotation marks omitted) (quoting *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (in turn quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996)). *See also McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1063 (6th Cir. 2014) ("If a plan affords such discretion to an administrator or fiduciary, [the Court] review[s] the

---

[7] Plaintiff argues he is automatically entitled to benefits under the Plan because BCBSMA did not respond to his second appeal within the thirty-day deadline set for a post-denial claim. (Doc. 71 at 15, citing *Univ. Hosps. of Cleveland v. S. Lorain Merchants Ass'n Health & Welfare Benefit Plan & Tr.*, 441 F.3d 430, 434 (6th Cir. 2006)). *Univ. Hosps. Of Cleveland* does not stand for the proposition advanced by plaintiff, and plaintiff has failed to factually and legally develop this claim. Therefore, the Court deems it waived.

denial of benefits only to determine if it was 'arbitrary and capricious.'") (quoting *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456-57 (6th Cir. 2003) (internal citation omitted)).

BCBSMA argues that the arbitrary and capricious standard of review applies because both the Subscriber Certificate and the premium account agreement between Alkermes and BCBSMA provide BCBSMA with full discretionary authority over benefits determinations. (Doc. 70 at 10). BCBSMA argues that the newly produced operative Subscriber Certificate does not alter the Court's application of the arbitrary and capricious standard of review. (Doc. 77 at 3). BCBSMA maintains that the premium account agreement between Alkermes and BCBSMA explicitly grants BCBSMA discretionary authority to determine eligibility for benefits, and both the operative and incorrect Subscriber Certificates make clear that the premium account agreement is part of the "benefits plan" at issue. (*Id.* at 4).

Plaintiff argues that the operative Subscriber Certificate proves that *de novo* review is required. (Doc. 79 at 7). Plaintiff argues that while the incorrect Subscriber Certificate includes discretionary language that would suggest a more deferential standard of review, the operative Subscriber Certificate notably omits this language. (*Id.* at 8).

In determining the proper standard of review, the Court examines the language of the plan to determine whether the plan administrator is granted the necessary discretionary authority. *Yeager*, 88 F.3d at 380. While a plan need not contain the word "discretion" to signify a grant of discretion, "merely subjecting a claim to a requirement of proof does not bestow discretionary authority on an administrator." *Torello v. UNUM Life Ins. Co. of Am.*, 201 F.3d 441 (6th Cir. 1999) (internal quotation omitted). Accordingly, a plan must confer discretion "expressly" and "clearly" for arbitrary and capricious review to apply. *Springer v. Cleveland Clinic Employee Health Plan Total Care*, 900 F.3d 284, 288 (6th Cir. 2018). Without an express grant of

authority, the Sixth Circuit has "rejected the proposition 'that the right to make coverage determinations presupposes discretionary authority.'" *Id.* (quoting *Tiemeyer v. Comm. Mut. Ins. Co.*, 8 F.3d 1094, 1099 (6th Cir. 1993)). "When considering whether a clear grant of discretion is given, courts are to 'focus on the breadth of the administrators' power—their authority to determine eligibility for benefits or to construe the terms of the plan.'" *Wagner v. Ciba Corp.*, 743 F. Supp. 2d 701, 709 (S.D. Ohio 2010) (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc) (internal quotation marks omitted)).

In this case, the operative Subscriber Certificate in effect at the time of plaintiff's surgery expressly states: "*Blue Cross and Blue Shield* decides which health care services and supplies that you receive (or you are planning to receive) are medically necessary and appropriate for coverage." (Doc. 77-2, PAGEID# 1655). Unlike the language in the incorrect Subscriber Certificate,[8] this language does not give BCBSMA a clear grant of discretionary authority under the Plan. The Sixth Circuit "has consistently required more than general authorizing language to establish the discretion required for an arbitrary and capricious standard of review." *Phillips v. Teamsters Local 639 Employers Health & Pension Tr.*, 79 F. Supp. 2d 847, 851 (N.D. Ohio 2000). Therefore, even where plan documents gave the administrator power to "make all decisions on claims" and vested the administrator with "the management and control of the operation and administration of claim procedures under the Plan," the Sixth Circuit has declined to find the necessary indication of intent to vest a plan administrator with discretionary authority. *Id.* (citing *Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372 (6th Cir. 1996)).

---

[8] The incorrect Subscriber Certificate states: "*Blue Cross and Blue Shield* has the discretion to determine which health care services and supplies you receive (or are planning to receive) are *medically necessary* and appropriate for coverage." (Doc. 77-3, PAGEID# 1779).

Moreover, the First Circuit Court of Appeals applied a *de novo* standard of review based on identical Plan language as contained in the operative Subscriber Certificate in this case. In *Stephanie C. v. Blue Cross Blue Shield of Massachusetts, Inc.*, 813 F.3d 420 (1st Cir. 2016), the First Circuit explained:

> The principal language to which both BCBS and the district court advert in support of their shared conclusion that the Plan confers a clear grant of discretionary decisionmaking authority is contained in the Certificate. In this respect, the Certificate states that BCBS "decides which health care services and supplies that you receive (or you are planning to receive) are medically necessary and appropriate for coverage." The power to decide, they say, necessarily implies the existence of discretion.
>
> In our view, the quoted language simply cannot carry the weight that BCBS and the district court load upon it. That language merely restates the obvious: that no benefits will be paid if BCBS determines they are not due. *See Diaz*, 424 F.3d at 637-38 (noting that "[a]ll plans require an administrator first to determine whether a participant is entitled to benefits before paying them").
>
> Clarity of language is crucial to accomplishing a grant of discretionary authority under an ERISA plan, and the Certificate lacks that degree of clarity. Under our case law, the "BCBS decides" language falls well short of what is needed for a clear grant of discretionary authority. *See Gross*, 734 F.3d at 15-16; *see also Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000). *Put bluntly, the quoted language is not sufficiently clear to give notice to either a plan participant or covered beneficiary that the claims administrator enjoys discretion in interpreting and applying plan provisions.*

*Stephanie C.*, 813 F.3d at 428 (emphasis added). The First Circuit further explained that the "BCBS decides" language contains a "subtle at best" inference of discretion and fails to "*unambiguously* indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances." *Id.* (emphasis in original).

Consistent with the First Circuit in *Stephanie C.* and Sixth Circuit precedent requiring more than general authorizing language to establish discretion, the Court concludes that the operative Subscriber Certificate providing that "*Blue Cross and Blue Shield* decides which health care services and supplies that you receive (or you are planning to receive) are medically

necessary and appropriate for coverage" does not clearly grant discretion to BCBSMA to construe Plan terms and make eligibility determinations. This language does not give clear notice to a plan participant that BCBSMA enjoys discretion in interpreting the provisions of the Plan. *Stephanie C.*, 813 F.3d at 428.

The Court disagrees with BCBSMA that the differences between the operative Subscriber Certificate (which omits the language "Blue Cross and Blue Shield has the discretion to determine which health care services . . . you receive") and the incorrect Subscriber Certificate (which includes this language) are immaterial and should not alter the Court's application of the arbitrary and capricious standard of review. BCBSMA argues that the premium account agreement between BCBSMA and plaintiff's employer, Alkermes, grants BCBSMA discretionary authority to determine eligibility for benefits and should be considered in conjunction with the Subscriber Certificate. (Doc. 77 at 4). The premium account agreement states, in relevant part:

> Blue Cross and Blue Shield is the fiduciary to whom you have granted full discretionary authority to make decisions regarding the amount, form and timing of benefits; to conduct medical necessity review; to apply utilization management; to exercise fair and impartial review of denied claims for services; and to resolve any other matter under the benefits plan which is raised by a Member or identified by Blue Cross and Blue Shield regarding entitlement to benefits as described in the Subscriber Certificates for your benefits plan. All determinations of Blue Cross and Blue Shield with respect to any matter within its assigned responsibility will be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Doc. 25, PAGEID# 800).

The First Circuit in *Stephanie C.* considered and rejected the precise argument that BCBSMA advances here. Similar to *Stephanie C.*, there is no evidence in this case that the premium account agreement was ever disclosed to plaintiff when coverage attached. The premium account agreement cannot be used against plaintiff to bring clarity to an ambiguously

worded grant of discretion when "the terms appear in a financing agreement between the employer and the claims administrator that was never seasonably disseminated to the beneficiaries against whom enforcement is sought." *Stephanie C.*, 813 F.3d at 429.

BCBSMA also argues that the premium account agreement is part of the benefits Plan at issue because it is referenced in the Subscriber Certificate and therefore plaintiff should have been on notice of the premium account agreement. (Doc. 77 at 4). However, plaintiff had "no obligation to go in search of undelivered documented in order to ascertain whether BCBS[MA] had reserved for itself discretionary decisionmaking authority." *Stephanie C.*, 813 F.3d at 429 n.1 (citing *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 249 (6th Cir. 1996) (explaining that the critical consideration "is the language actually given to the employees and upon which they could reasonably have relied")). Moreover, a core requirement of ERISA is that each "employee benefit plan shall be established and maintained pursuant to a written instrument" that serves the purpose of "enabling beneficiaries to learn their rights and obligations at any time." *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 561 (6th Cir. 2015) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)). As such, courts across the country have found that contracts between a claims administrator and an employer-funded benefit plan are not ERISA plan documents. *See Long Island Neurological Assocs., P.C. v. Highmark Blue Shield*, 375 F. Supp. 3d 203, 207 (E.D.N.Y. 2019) (collecting cases). *See also L & W Assocs. Welfare Ben. Plan v. Estate of Wines ex rel. Wines*, No. 12-cv-13524, 2014 WL 117349, at *8 (E.D. Mich. Jan. 13, 2014) (rejecting the argument that an administrative services contract, which was a contract governing the terms between the administrator and the employer's self-funded employee welfare benefit plan, was a plan document because it "contains no benefit-defining language" and "does nothing to apprise plan participants of their benefits or rights under the Plan"). Accordingly,

because the Plan itself does not clearly grant discretion to BCBSMA to make benefits determinations, the *de novo* standard of review applies to the substantive decisions made in this case.[9]

### B. Whether BCBSMA Erred by Considering the InterQual Guidelines in its Medical Necessity Denial Decision.

Plaintiff contends that BCBSMA failed to follow the terms of the Plan by substituting an "outside document, InterQual, in lieu of applying the Plan language." (Doc. 69 at 17). Plaintiff states that the InterQual guidelines constitute an "amendment of the Plan without express authority of the Plan sponsors." (Doc. 73 at 22). Plaintiff argues that these guidelines add "additional terms and rules" to qualify for benefits eligibility. (*Id.* at 18). Plaintiff asserts that InterQual is simply a list of "medical factors" to be considered in determining whether a patient should consider treatment and is irrelevant to whether a procedure falls under the Plan's definition of medical necessity. (*Id.* at 19). Plaintiff states that both Dr. Lewis's initial denial determination and Ms. Flanagan Abreu's appeal denial letter failed to identify Plan language related to medical necessity and instead defer to the InterQual Smartsheet. (*Id.*). Plaintiff maintains that BCBSMA improperly used the InterQual guidelines over the Plan language to deny benefits.

BCBSMA contends that its reliance on the InterQual criteria is "fully supported by the Plan," which provides that a healthcare service must be consistent with BCBSMA medical policies in order to be considered medically necessary. (Doc. 72 at 8, citing Doc. 77-2, PAGEID# 1655). BCBSMA alleges that under the terms of the Plan, BCBSMA may consider "clinical sources that are generally accepted and credible" in determining medical necessity. (*Id.*

---

[9] Because *de novo* review applies in this case, the Court need not consider plaintiff's arguments that defendant "abdicated" discretionary review by relying on the opinion of Dr. Segal or that BCBSMA had a "substantial conflict of interest" because it selectively treated plaintiff's claim as a "high dollar claim."

at 9, citing Doc. 77-2, PAGEID# 1654). BCBSMA also alleges that the InterQual guidelines specifically state they are intended for use as "screening guidelines with respect to medical appropriateness of healthcare services" (*Id.*, citing Doc. 25, PAGEID# 709), and federal courts have approved BCBSMA's use of InterQual guidelines in determining medical necessity. (*Id.*, citing *Jon N. v. BCBSMA*, 684 F. Supp. 2d 190, 196 (D. Mass. 2010); *Smith v. BCBSMA, Inc.*, 597 F. Supp. 2d 214, 221-22 (D. Mass. 2009); *Stephanie C.*, 852 F.3d at 116-17).

The Court concludes that BCBSMA did not err by considering InterQual guidelines as one factor in deciding medical necessity under the terms of the Plan. The Plan states that in determining whether health care services are medically necessary, the health care services must be "[c]onsistent with the diagnosis and treatment of your condition and in accordance with *Blue Cross and Blue Shield medical policies* and *medical technology assessment criteria*[.]" (Doc. 77-2, PAGEID# 1655) (emphasis in original). The "medical policy" provision of the Plan states, in relevant part:

> To receive your health plan coverage, your health care services and supplies must meet the criteria for coverage that are defined in each *Blue Cross and Blue Shield medical policy* that applies. . . . These policies are based upon *Blue Cross and Blue Shield's* assessment of the quality of the scientific and clinical evidence that is published in peer reviewed journals. *Blue Cross and Blue Shield* may also consider other clinical sources that are generally accepted and credible. (These sources may include specialty society guidelines, textbooks, and expert opinion.). These *medical policies* explain *Blue Cross and Blue Shield's* criteria for when a health care service or supply is *medically necessary*, or is not *medically necessary*, or is investigational.

(*Id.*, PAGEID# 1654) (emphasis in original). In determining medical necessity, the Plan language explicitly requires that health care services meet BCBSMA medical policies that are formulated based on generally acceptable clinical sources. Moreover, as BCBSMA argues, courts have acknowledged that the InterQual guidelines are "nationally recognized, third-party guidelines." *Stephanie C.*, 852 F.3d at 114. The case upon which plaintiff relies, *Univ. Hosps.*

*of Cleveland v. Emerson Elec. Co. Ben. Plan*, No. 93-4394, 1994 WL 714326 (6th Cir. Jan. 10, 1994), is distinguishable. In *Univ. Hosps. of Cleveland*, the Sixth Circuit concluded that the defendant "erroneously based its decision upon documents that define a pre-existing condition differently than do the actual Plan provisions." *Id.* at *1. Unlike the plan in *Univ. Hosps. of Cleveland*, the medical necessity definition in the Plan in this case includes Blue Cross and Blue Shield's "medical policy" as one of the guideposts for determining medically necessary services, and the medical policy incorporates guidelines such as InterQual. Therefore, BCBSMA was permitted to consider the InterQual guidelines as one factor in determining whether plaintiff's lumbar surgery was a medically necessary health care service under the Plan. Accordingly, BCBSMA did not err in considering the InterQual guidelines in this case.

### C. Whether BCBSMA's Decision to Deny Coverage for Plaintiff's Lumbar Surgery was Correct.

Plaintiff argues that BCBSMA's decision to deny coverage for his surgery was based on a selective picking of the evidence that ignored favorable evidence from his medical records and was not based on the "medical necessity" language of the Plan. (Doc. 69 at 20-21; Doc. 73 at 9). Plaintiff argues that BCBSMA ignored the operative report clearly showing lumbar nerve root involvement, which is contrary to BCBSMA's finding that surgery was unnecessary because imaging studies failed to show nerve root compression. (Doc. 69 at 21). Plaintiff also alleges his records show prior conservative treatment, including home exercise and physical therapy, was unsuccessful, and sensory deficits on clinical examination. (*Id.*; Doc. 73 at 9, citing Doc. 25, PAGEID## 755, 762).

BCBSMA alleges that the medical evidence supports its decision to deny coverage. (Doc. 72 at 4). BCBSMA argues that it repeatedly requested medical records from plaintiff and considered all of the medical records submitted to it as part of plaintiff's claim and appeal. (*Id.*,

citing Doc. 25, PAGEID## 664-69, 675-703; Doc. 26, PAGEID## 990, 994, 1002, 1007-24); (*see also* Doc. 87-1, PAGEID## 2387, 2391, 2399). BCBSMA asserts that the only medical imaging submitted shows no evidence of nerve root compression. (*Id.* at 5, citing Doc. 25, PAGEID# 699). BCBSMA argues that the operative report showing nerve root involvement is inconclusive and conflicts with the InterQual guidelines that specify that the imaging findings must correlate with symptoms before surgery is considered. (*Id.*, citing Doc. 25, PAGEID# 711). According to BCBSMA, there is no current documentation of conservative treatment failure, contrary to plaintiff's representation. (*Id.* at 6). BCBSMA further contends that Dr. Segal's opinion regarding conservative treatment failure is consistent with Dr. Valentin's records, who never concluded that NSAID use or physical therapy was ineffective for plaintiff's condition. (*Id.*, citing Doc. 25, PAGEID## 692, 694, 675-703). BCBSMA argues that Dr. Valentin's records fully support BCBSMA's decision. (*Id.* at 7, citing Doc. 25, PAGEID## 692-93).

As explained above, when applying a *de novo* standard of review, this Court's role is to determine whether BCBSMA "made a correct decision." *Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009). The Court gives no deference to BCBSMA's decision and is limited to the administrative record before BCBSMA. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 658 (6th Cir. 2013); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). Based on the administrative record before BCBSMA, the Court must determine whether BCBSMA "properly interpreted the plan" and whether plaintiff "was entitled to benefits under the plan." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002).

The Court finds that BCBSMA improperly interpreted the terms of the Plan by limiting the medical necessity inquiry to whether plaintiff satisfied the InterQual criteria. To be eligible

for coverage in this case, plaintiff's surgery must have been medically necessary under the Plan. The Plan's definition of medical necessity, however, is not limited to the InterQual guidelines. Rather, the Plan defines medical necessity by "***using** all of the guidelines described*" in the Plan and not solely the InterQual guidelines. (Doc. 77-2, PAGEID# 1655) (emphasis added). In addition to BCBSMA's medical policies, which include the InterQual guidelines, the Plan sets forth six other guidelines that must be "used" in deciding whether a service is "medically necessary." (*Id.*).

In this case, BCBSMA's denial was based solely on the InterQual guidelines and omitted any reference to the other guidelines in the Plan defining medical necessity, all of which the Plan specifies will be used in determining medical necessity. (*Id.*). Dr. Segal's review was based solely on the InterQual guidelines, and his opinion that plaintiff's surgery was not medically necessary failed to "us[e] *all* of the guidelines" defining medical necessity set forth in the Plan.[10] Indeed, Dr. Segal's "rationale" for denying the claim states, "The requested service is NOT medically necessary for the member's condition *based on failure to meet criteria in the provided InterQual guidelines*." (Doc. 81, PAGEID# 1957) (emphasis added).

Additionally, there is no indication that either Dr. Segal or BCBSMA actually considered the operative report documenting nerve root compression. The operative report from Dr. Kakarlapudi at the Laser Spine Surgery Center describes the procedure, in relevant part:

> We were looking at a *nerve root which clearly had significant pressure* from the lateral recess which was also retracted medially. We were looking at a *large disc herniation that was causing additional pressure on the nerve root.* Thus, an annulotomy was performed and discectomy was performed until there was no additional pressure noted on the traversing nerve root at this level. . . .

---

[10] BCBSMA attempts to shoehorn Dr. Segal's opinions into the non-InterQual criteria for medical necessity under the Plan. BCBSMA argues, "Based on the evidence in the record, the Procedure [surgery] is not something that Dr. Segal, "using prudent clinical judgment, would provide to [Mr. Canter] in order to . . . treat [his] symptoms." (Doc. 70, PAGEID# 1390, citing Doc. 26, PAGEID# 838). BCBSMA quotes from the Plan language and attributes it to Dr. Segal, which constitutes an improper post-hoc rationalization for the denial decision.

(Doc. 25, PAGEID## 747-48) (emphasis added). While BCBSMA was entitled to rely on the InterQual Guidelines as one factor in its decision, it was inappropriate for BCBSMA to strictly rely on the lack of "imaging" evidence under the InterQual guidelines and ignore other evidence documenting plaintiff's condition. Dr. Kakarlapudi's operative report indicates that the nerve root of plaintiff's lumbar spine had significant pressure. (*See id.*). BCBSMA argues that this report is "inconclusive" because the InterQual guidelines explain that "evidence of neurocompression may be . . . described as 'neural compression,' 'nerve root impingement,' or 'nerve root entrapment.' Other terms such as 'nerve root enhancement,' 'displacement,' 'effacement,' or 'encroachment' without specific mention of nerve root impingement or entrapment do not represent neurocompression." (Doc. 72 at 6) (citing Doc. 25, PAGEID# 711). However, the InterQual guidelines fail to consider that nerve root compression is in fact pressure on the nerve, which is documented in Dr. Kakarlapudi's operative report. *See Gliebe v. Astrue*, No. 1:10-cv-002566, 2011 WL 7144817, at *19 (N.D. Ohio Dec. 30, 2011) (Report and Recommendation) (Social Security case noting that "nerve root compression is pressure on the nerve"), *adopted*, 2012 WL 275057 (N.D. Ohio Jan. 31, 2012).[11] The April 2016 appeal denial letter and Dr. Segal's report fail to mention or discuss the surgical record findings. Nor do they explain why the surgical evidence of "significant" nerve pressure outlined by Dr. Kakarlapudi in his surgical report and the "excellent relief" plaintiff experienced with his right leg pain postoperatively were not credited over the three-year-old MRI and other evidence upon which

---

[11] "Spinal cord compression is caused by any condition that puts pressure on your spinal cord," which is "the bundle of nerves that carries messages back and forth from your brain to your muscles and other soft tissues." *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/spinal-cord-compression (last visited on Jan. 6, 2020).

"Decompression" is defined as "opening or removal of bone to relieve pressure and pinching of the spinal nerves." *See* https://mayfieldclinic.com/pe-sten.htm (last visited on Jan. 6, 2020).

BCBSM relied. *Cf. Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 509-100 (6th Cir. 2005) (failure to discuss findings of treating doctor called into question administrator's reliance on file reviewer's opinion). In the absence of any mention or discussion of Dr. Kakarlapudi's findings in the operative report or the remaining guidelines defining medical necessity under the Plan, the Court cannot conclude that BCBSMA made the "correct decision" to deny coverage for plaintiff's surgery. *Shelby Cnty. Health Care Corp.*, 581 F.3d at 368.

As discussed above, the Court's *de novo* review is confined to the administrative record upon which BCBSMA made its decision. This means that Dr. Kakarlapudi's "Medical Necessity Opinion Questionnaire," which was submitted by plaintiff after BCBSMA made its appeal decision, cannot be considered on *de novo* review. Therefore, the existing administrative record does not provide a sufficient basis upon which the Court could determine, on the merits, whether plaintiff's surgery was medically necessary. As there is insufficient information in the administrative record for this Court to determine in the first instance whether plaintiff's surgery met the definition of medical necessity set forth in the Plan, this matter should be remanded to BCBSMA with instructions to reopen the administrative record and redetermine plaintiff's claim for benefits as explained below.

## IV. REMEDY

Where the Court determines an erroneous denial of ERISA benefits, it "may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Metro Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). Courts have "considerable discretion to craft a remedy after finding a mistake in the denial of benefits." *Id.* at 622. As the Sixth Circuit has explained:

> Remand . . . is appropriate in a variety of circumstances, particularly where the plan administrator's decision suffers from a procedural defect or the administrative

record is factually incomplete. For example, where the plan administrator fails to comply with ERISA's appeal-notice requirements in adjudicating a participant's claim, the proper remedy is to remand the case to the plan administrator "so that a 'full and fair review' can be accomplished." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008). Courts adopting this position have reasoned that a procedural violation does not warrant the substantive remedy of awarding benefits. *See id.* at 241. Remand also is appropriate where the plan administrator merely "fail[ed] . . . to explain adequately the grounds of [its] decision." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002). In addition to procedural irregularities, an incomplete factual record provides a basis to remand the case to the plan administrator. *E.g., Miller v. United Welfare Fund*, 72 F.3d 1066, 1073-74 (2d Cir. 1995) (remanding after determining that "[t]he present record is incomplete").

In contrast, where "there [was] no evidence in the record to support a termination or denial of benefits," an award of benefits is appropriate without remand to the plan administrator. *E.g., DeGrado*, 451 F.3d at 1176; *see Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009) (ordering remand to the plan administrator after determining that the record did not "clearly establish[ ]" that the claimant was entitled to benefits). Thus, where a plan administrator properly construes the plan documents but arrives at the "wrong conclusion" that is "simply contrary to the facts," a court should award benefits. *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001). Under such circumstances, "remand is not justified" to give the plan administrator "a second bite at the apple." *Id.*

*Shelby Cty. Health Care Corp.*, 581 F.3d at 373-74. In other words, "where the problem is with the integrity of [the plan's] decision-making process, rather than that [a claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622 (internal quotations omitted). "[E]ven under *de novo* review, remand is the appropriate remedial measure where further fact-finding is necessary to determine claimant eligibility for benefits." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 699-700 (6th Cir. 2014) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000) (recognizing that remand is proper where there are factual determinations that need to be made to determine whether a participant is entitled to benefits)).

A remand of this matter to BCBSMA is the appropriate remedy in this case for several reasons. First, the Court should sustain plaintiff's procedural challenges to BCBSMA's notice of denial. As explained above, BCBSMA's denial letter failed to advise plaintiff of the information he needed to perfect his appeal. The denial letter also failed to advised plaintiff that BCBSMA's request for records from the Laser Spine Institute was limited solely to the date of plaintiff's surgery and omitted the dates of plaintiff's objective testing and Dr. Kakarlapudi's pre-surgery clinical examination. As a result, BCBSMA's decision suffers from both procedural defects and a factually incomplete administrative record, indicating that remand is the appropriate remedy. Second, while Dr. Kakarlapudi's surgical report and medical necessity questionnaire appear to be strong evidence supporting a finding of medical necessity, the Court cannot say "there [was] *no* evidence in the record to support a . . . denial of benefits. . . ." *Shelby Cty. Health Care Corp.*, 581 F.3d at 373 (emphasis added). The decision as to whether plaintiff's surgery satisfies the medical necessity definition of the operative Plan involves factual determinations that should be made in the first instance by BCBSMA upon a fully developed record. *See Elliott*, 473 F.3d at 622 ("[A] remand to the district court with instructions to remand to [the claims administrator] for a full and fair inquiry is the proper remedy here. . . . Such a remedy will allow for a proper determination of whether, in the first instance, [plaintiff] [was] entitled to . . . benefits."); *Basham v. Prudential Ins. Co. of Am.*, No. 3:11-cv-00464, 2014 WL 708491, at *8 (W.D. Ky. Feb. 24, 2014) ("Without a more developed factual record, remand is particularly appropriate because the Court lacks both the information and expertise necessary to make a decision on [the plaintiff's] claim in the first instance.").[12] Therefore, a remand to BCBSMA for a

---

[12] Plaintiff contends "the proper remedy for a failure to provide an appropriate administrative review is to have the district court 'reconsider [the denial of benefits] after the [claimant] has been given an opportunity to submit additional evidence' rather than remanding the case to the Plan for further consideration." (Doc. 69 at 24, citing

redetermination of plaintiff's claim for benefits based on a complete administrative record is warranted in this case.

## V. PLAINTIFF'S CLAIMS UNDER 29 U.S.C. §§ 1132(a)(3) AND 1132(c)(1)

In his complaint, plaintiff alleges that BCBSMA has breached its fiduciary duty to plaintiff under 29 U.S.C. § 1104(a)(1) and failed to produce the entire Plan with the Schedule of Benefits and other relevant sections in violation of 29 U.S.C. § 1132(c)(1). (Doc. 1, ¶¶ 38-43). Plaintiff has now clarified that his breach of fiduciary duty claims are subsumed in his claim for payment of benefits under 29 U.S.C. § 1132(a)(1)(B) (Doc. 71, PAGEID## 1426-1428), which have been thoroughly discussed by the Court above. Therefore, the Court need not address any such claim separately to the extent such claim exists. Plaintiff also states he is not requesting penalties under 29 U.S.C. § 1132(c)(1) against BCBSMA. (Doc. 71, PAGEID# 1428). Therefore, judgment for BCBSMA is appropriate on this claim.

---

*Univ. Hosps. of Cleveland v. S. Lorain Merchants Ass'n Health & Welfare Benefit Plan & Tr.*, 441 F.3d 430, 434 (6th Cir. 2006)).

In *Univ. Hosps. of Cleveland*, the Sixth Circuit Court of Appeals, relying on *VanderKlok*, stated that rather than remanding the case to the plan administrator for further fact finding, "the district court should have conducted the review of the case itself and permitted University Hospital to introduce additional evidence as to its reasonable and medically needed additional charges." 441 F.3d at 434. However, as recognized by one district court, the *Univ. Hosps. of Cleveland* court "ignored an earlier published decision and remand in which the Sixth Circuit stated that '[i]f the denial notice is not in substantial compliance with § 1133, reversal and remand to the district court *or to the plan administrator* is ordinarily appropriate.'" *Lucia Zamorano, M.D., P.C. v. Roofers Local 149-Sec. Benefit Tr. Fund*, No. 14-10565, 2015 WL 9478024, at *3 (E.D. Mich. Dec. 29, 2015) (quoting *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005) (emphasis added)). It appears the greater weight of Sixth Circuit authority does not follow the *Univ. Hosps. of Cleveland* categorical approach prohibiting remand. Rather, where the "problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled," the court will remand to the plan administrator. *Card v. Principal Life Ins. Co.*, No. 18-6095, 2019 WL 5618182, at *9 n.7 (6th Cir. Oct. 31, 2019) (quoting *Elliot*, 473 F.3d at 622) (brackets and quotation marks omitted)); *see also Zuke v. Am. Airlines, Inc.*, 644 F. App'x 649, 655 (6th Cir. 2016); *Godmar v. Hewlett-Packard Co.*, 631 F. App'x 397, 407-08 (6th Cir. 2015); *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 551 (6th Cir. 2015); *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 609 (6th Cir. 2014); *Burge v. Republic Engineered Prod., Inc.*, 432 F. App'x 539, 551 (6th Cir. 2011); *Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 380 (6th Cir. 2011); *Shelby Cty. Health Care Corp.*, 581 F.3d at 373. For the reasons discussed above, the Court determines that a remand to BCBSMA is the appropriate remedy in this case.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Plaintiff's motion for judgment as a matter of law (Doc. 69) be **GRANTED** on his procedural claims under 29 U.S.C. § 1133 and substantive claims under 29 U.S.C. § 1132(a)(1)(B) and this matter be remanded to BCBSMA for reconsideration of plaintiff's claim for benefits based upon a complete administrative record.  Plaintiff's motion should be **DENIED** in all other respects.

2.  Defendant's motion for judgment on the administrative record (Doc. 70) be **GRANTED** on plaintiff's 29 U.S.C. § 1132(c) claim and **DENIED** in all other respects.

Date:  1/22/2020

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KEITH W. CANTER,
    Plaintiff,

    vs.

ALKERMES BLUE CARE ELECT
PREFERRED PROVIDER PLAN, et al.,
    Defendants.

Case No. 1:17-cv-399
Cole, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).